1  James D. Hunley
2  4438 East Cathedral Rock Drive
3  Phoenix, Arizona 85044
4  (480)-940-1049
5  Pro Se

```
┌─────────────────────────────┐
│  �_____ FILED    _____ LODGED │
│  _____ RECEIVED  ____ COPY   │
│                               │
│      OCT 1 9 2005             │
│                               │
│   CLERK U S DISTRICT COURT    │
│   DISTRICT OF ARIZONA         │
│  BY_____ E. DEPUTY │
└─────────────────────────────┘
```

6              UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8  James Dwight Hunley,                    Case No. CV'05 1879 PHX DGC
9                    Plaintiff,
10 v.                                      **AMENDED COMPLAINT**
11 Orbital Sciences Corporation;           **(Jury Trial Demanded)**
12 Richard Mark Haynie;
13 Louis M. Amorosi and Gina M. Amorosi;
14 Richard L. Fahrner and Janet R. Fahrner;
15 Ronald J. Grabe and Lynn O'Keefe-Grabe;
16 Mark J. Ogren and Cindy L. Ogren;
17 Satya Prasad Maganty
18 and Sowbhagya L. Maganty;
19 Brian T. Mullet and Lisa E. Mullet;
20 Michael G. Sims and Patricia C. Treharne;
21 Richard S. Straka and Purna R. Straka;
22 Craig N. Stuart and Susan K. Wyman;
23 Charles M. Whitmeyer and
24 Sandra L. Whitmeyer,
25                    Defendants.

1

1   Plaintiff James Dwight Hunley (hereinafter referred to as "Plaintiff") for his

2   causes of action against Defendants, alleges:

3   ## TABLE OF CONTENTS

4   I.   NATURE OF ACTION                                                                                          4

5   II.  GENERAL ALLEGATIONS (PARTIES, JURISDICTION, AND VENUE)                                 4

6      II.1  PARTIES                                                                                               4

7      II.2  JURISDICTION AND VENUE                                                                               10

8   III. DEMAND FOR JURY TRIAL                                                                                  11

9   IV.  FACTS COMMON TO ALL CAUSES OF ACTION                                                           12

10     IV.1  GENERAL ALLEGATIONS                                                                               12

11     IV.2  SIX YEARS OF HIGHLY FAVORABLE REVIEWS AND RAISES, 1996 - 2001                           24

12     IV.3  REVIEWS AND RAISES, THE SUDDEN AND NEGATIVE TREND, 2002                                   25

13     IV.4  PLAINTIFF BECOMES AN ORBITAL SUPERVISOR, 2003                                             28

14     IV.5  FIRST MEETING WITH HAYNIE, INTERVIEW FOR THE JOB                                           28

15     IV.6  SECOND MEETING WITH HAYNIE, FIRST WRITTEN REVIEW AS A SUPERVISOR                        31

16     IV.7  SECOND MEETING WITH HAYNIE, FIRST VERBAL INTERVIEW AS A SUPERVISOR                      37

17   V.  THE VERBAL STATEMENTS OF THE INTERIM REVIEW                                                    41

18     V.1  BEFORE THE SECOND MEETING                                                                       43

19     V.2  THE NEGATIVE TREND CONTINUES, 2003                                                           47

20     V.3  COMPLAINTS TO HUMAN RESOURCES                                                               47

21        V.3.1  First Grievance Report                                                                      47

22        V.3.2  Second Grievance Report                                                                     49

1    V.4    PLAINTIFF IS DEMOTED, 2004                                                    53

2    VI.  ADMINISTRATIVE PROCEDURES                                                       61

3    VII. DAMAGES                                                                         62

4    VIII.CAUSES OF ACTION AND CLAIMS FOR RELIEF                                          62

5      VIII.1  FIRST CAUSE OF ACTION (VIOLATIONS OF THE ADA)                              63

6         *VIII.1.1   Allegations Common to All Violations of the ADA*                    *63*

7         *VIII.1.2   Claim for Relief (Discrimination)*                                  *64*

8         *VIII.1.3   Claim for Relief (Retaliation)*                                     *64*

9         *VIII.1.4   Claim for Relief (Refusal to Accommodate)*                          *64*

10     VIII.2  SECOND CAUSE OF ACTION (VIOLATION OF THE FALSE CLAIMS ACT)                 66

11     VIII.3  THIRD CAUSE OF ACTION (DEFAMATION OF CHARACTER)                            66

12     VIII.4  THIRD CAUSE OF ACTION (FALSE LIGHT INVASION OF PRIVACY)                    67

13     VIII.5  FOURTH CAUSE OF ACTION (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)      68

14     VIII.6  FIFTH CAUSE OF ACTION (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)         68

15     VIII.7  SIXTH CAUSE OF ACTION (CIVIL CONSPIRACY)                                   68

16   IX.  REQUEST FOR JUDGEMENT                                                           69

17

1

## I. NATURE OF ACTION

1)      This civil action is brought forth to remedy Defendants' willful and wanton violations of Plaintiff's civil rights as protected by State and Federal laws.

2)      Defendants have committed acts and caused events to occur in the county of Maricopa and the state of Arizona which are the foundation of this action and out of which this action arises.

## II. GENERAL ALLEGATIONS (PARTIES, JURISDICTION, AND VENUE)

### II.1     Parties

3)      Plaintiff is a citizen of the United States. Plaintiff is presently 41 years of age and was born on January 20, 1964.

4)      Defendant Orbital Sciences is internationally recognized as a "Major Department of Defense Launch Vehicle Contractor" for contracts with the United States Department of Defense (hereinafter referred to as "DOD") and the National Aeronautics and Space Administration (hereinafter referred to as "NASA").

5)      The majority of Orbital's income comes from DOD and NASA contracts and has been at all relevant times herein. The majority of the employment activities of Orbital's employees and management within Orbital's Launch Systems Division ("LSG") is performed under DOD and NASA contracts and has at all relevant times

4

1  herein.

2       6)       All parties' employment positions and capacities with and for Defendant

3  Orbital Sciences as stated herein are within its Launch Systems Division, which is based

4  in Chandler, Arizona, and in the County of Maricopa.

5       7)       Plaintiff began employment with Defendant Orbital Sciences in August

6  1996. From that time until the present time he has served as an engineer and technical

7  staff member in the Guidance, Navigation, and Controls Department (hereinafter

8  referred to the "GN&C Department").

9       8)       Defendant Maganty serves as the Director of the GN&C Department and

10  Plaintiff's immediate supervisor and has done so from about August 1999 to the present

11  time.

12       9)       Defendant Haynie serves as the Director of Technical Operations and

13  Vice President and Defendant Maganty's immediate supervisor and has done so from

14  about August 1999 to the present time.

15       10)      Defendant Straka serves as the Chief Scientist and Vice President and has

16  done so from about August 1999 to the present time. Defendant Straka was Plaintiff's

17  and Defendant Maganty's immediate supervisor from August, 1996 to about August

18  1999.

19       11)      Plaintiff is a married man, a resident of Maricopa County, Arizona and a

20  U.S. citizen, and has at all relevant times.

5

1        12)    Defendant Orbital Sciences Corporation (hereinafter referred to as

2   "Defendant Orbital Sciences" or "Orbital Sciences" or "Orbital") is a Delaware

3   corporation authorized to do and is doing business in the State of Arizona and the

4   County of Maricopa.

5        13)    Orbital is engaged in an "industry affecting commerce" within the

6   meaning of § 101(7) of the ADA, 42 U.S.C. §12111(7), and § 701 of the Civil Rights

7   Act of 1964, as amended and modified, 42 U.S.C. §2000e et seq.

8        14)    Orbital employs 15 or more employees and is an "employer" within the

9   meaning of § 101(5)(A) of the ADA, 42 U.S.C. §12111(5)(A).

10       15)    Defendant Richard Mark Haynie (hereinafter referred to as either

11   "Defendant Haynie" or "Haynie") is a resident of Maricopa County, Arizona, and has

12   been at all relevant times. Defendant Haynie was at all times acting for and on behalf of

13   Defendant Orbital Sciences, and such actions were within the course and scope of his

14   authority.

15       16)    Defendant Louis M. Amorosi is a resident of Maricopa County, Arizona,

16   and has been at all relevant times. Defendant Louis M. Amorosi was at all times acting

17   for and on behalf of Defendant Orbital Sciences, and such actions were within the

18   course and scope of his authority. On information and belief, Defendants Louis M.

19   Amorosi (hereinafter referred to as "Defendant Amorosi" or "Amorosi") and Gina M.

20   Amorosi are husband and wife, and Defendant Gina M. Amorosi is being sued as a

6

1    member of the Amorosi marital community.

2        17)    Defendant Richard L. Fahrner is a resident of Maricopa County, Arizona,

3    and has been at all relevant times. Defendant Richard L. Fahrner was at all times acting

4    for and on behalf of Defendant Orbital Sciences, and such actions were within the

5    course and scope of his authority. On information and belief, Defendants Richard L.

6    Fahrner (hereinafter referred to as "Defendant Fahrner" or "Fahrner") and Janet R.

7    Fahrner are husband and wife, and Defendant Janet R. Fahrner is being sued as a

8    member of the Fahrner marital community.

9        18)    Defendant Ronald J. Grabe is a resident of Maricopa County, Arizona,

10   and has been at all relevant times. Defendant Ronald J. Grabe was at all times acting for

11   and on behalf of Defendant Orbital Sciences, and such actions were within the course

12   and scope of his authority. On information and belief, Defendants Ronald J. Grabe

13   (hereinafter referred to as "Defendant Grabe" or "Grabe") and Lynn O'Keefe-Grabe are

14   husband and wife, and Defendant Lynn O'Keefe-Grabe is being sued as a member of

15   the Grabe marital community.

16       19)    Defendant Mark J. Ogren is a resident of Maricopa County, Arizona, and

17   has been at all relevant times. Defendant Mark J. Ogren was at all times acting for and

18   on behalf of Defendant Orbital Sciences, and such actions were within the course and

19   scope of his authority. On information and belief, Defendants Mark J. Ogren

20   (hereinafter referred to as "Defendant Ogren" or "Ogren") and Cindy L. Ogren are

1    husband and wife, and Defendant Cindy L. Ogren is being sued as a member of the

2    Ogren marital community.

3         20)    Defendant Satya Prasad Maganty is a resident of Maricopa County,

4    Arizona, and has been at all relevant times. Defendant Satya Prasad Maganty was at all

5    times acting for and on behalf of Defendant Orbital Sciences, and such actions were

6    within the course and scope of his authority.  On information and belief, Defendants

7    Satya Prasad Maganty (hereinafter referred to as "Defendant Maganty" or "Maganty")

8    and Sowbhagya L. Maganty are husband and wife, and Defendant Sowbhagya L.

9    Maganty is being sued as a member of the Maganty marital community.

10         21)    Defendant Brian T. Mullet is a resident of Maricopa County, Arizona, and

11    has been at all relevant times. Defendant Brian T. Mullet was at all times acting for and

12    on behalf of Defendant Orbital Sciences, and such actions were within the course and

13    scope of his authority. On information and belief, Defendants Brian T. Mullet

14    (hereinafter referred to as "Defendant Mullet" or "Mullet") and Lisa E. Mullet are

15    husband and wife, and Defendant Lisa E. Mullet is being sued as a member of the

16    Mullet marital community.

17         22)    Defendant Michael G. Sims is a resident of Maricopa County, Arizona,

18    and has been at all relevant times. Defendant Michael G. Sims was at all times acting

19    for and on behalf of Defendant Orbital Sciences, and such actions were within the

20    course and scope of his authority. On information and belief, Defendants Michael G.

8

1   Sims (hereinafter referred to as "Defendant Sims" or "Sims") and Patricia C. Treharne

2   are husband and wife, and Defendant Patricia C. Treharne is being sued as a member of

3   the Sims marital community.

4      23) Defendant Richard S. Straka is a resident of Maricopa County, Arizona,

5   and has been at all relevant times. Defendant Richard S. Straka was at all times acting

6   for and on behalf of Defendant Orbital Sciences, and such actions were within the

7   course and scope of his authority. On information and belief, Defendants Richard S.

8   Straka (hereinafter referred to as "Defendant Straka" or "Straka") and Purna R. Straka

9   are husband and wife, and Defendant Purna R. Straka is being sued as a member of the

10  Straka marital community.

11     24) Defendant Craig N. Stuart is a resident of Maricopa County, Arizona, and

12  has been at all relevant times. Defendant Craig N. Stuart was at all times acting for and

13  on behalf of Defendant Orbital Sciences, and such actions were within the course and

14  scope of his authority. On information and belief, Defendants Craig N. Stuart

15  (hereinafter referred to as "Defendant Stuart" or "Stuart") and Susan K. Wyman are

16  husband and wife, and Defendant Susan K. Wyman is being sued as a member of the

17  Stuart marital community.

18     25) Defendant Charles M. Whitmeyer is a resident of Maricopa County,

19  Arizona, and has been at all relevant times. Defendant Charles M. Whitmeyer was at all

20  times acting for and on behalf of Defendant Orbital Sciences, and such actions were

1   within the course and scope of his authority. On information and belief, Defendants

2   Charles M. Whitmeyer (hereinafter referred to as "Defendant Whitmeyer" or

3   "Whitmeyer") and Sandra L. Whitmeyer are husband and wife, and Defendant Sandra

4   L. Whitmeyer is being sued as a member of the Whitmeyer marital community.

5        26)    On information and belief, the business of Defendants is so intermingled

6   that the separate identity of these Defendants has ceased to exist.

7   **II.2    Jurisdiction and Venue**

8        27)    This court has jurisdiction over Plaintiff's claims for alleged violations of

9   the Americans with Disabilities Act (hereinafter the "ADA"), as amended and modified,

10   42 U.S.C. §12117, pursuant to Section 107(a) of the ADA, which incorporates by

11   reference §706 of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as

12   amended and modified, 42 U.S.C. §2000e-5 et seq.

13        28)    This court has jurisdiction pursuant to 28 U.S.C. § 1331, and 28 U.S.C. §

14   1343(a)(4).

15        29)    All conditions precedent to jurisdiction under §706 of Title VII, 42 U.S.C.

16   §2000e-5(f)(3), have occurred or been complied with as follows:

17        a)  Plaintiff filed a charge of employment discrimination on the basis of

18   disability, retaliation, and denial of accommodation with the Equal Employment

19   Opportunity Commission (hereinafter referred to as the "EEOC") within 180 days of the

20   commission of the unlawful employment practice alleged herein.

10

b)  A Notification of Right to Sue was mailed to Plaintiff by the EEOC on March 25, 2005.

c)  This complaint has been filed by Plaintiff within 90 days of Plaintiff's receipt of the EEOC's Notification of Right to Sue Letter.

30)     This court has jurisdiction over Plaintiff's claims for alleged violations of the Federal False Claims Act (hereinafter the "FCA") pursuant to the False Claims Act, 31 U.S.C. §3730(h).

31)     This court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32)     This court has pendent jurisdiction over Plaintiff's civil conspiracy claim pursuant to 28 U.S.C. § 1367(a).

33)     This court has coexistent jurisdiction over Plaintiff's civil conspiracy claim based on having jurisdiction over the tort claims underlying Plaintiff's civil conspiracy claim.

34)     Venue is proper pursuant to 28 U.S.C.  §1391 because a substantial part of the acts complained of herein occurred within the State of Arizona.

## III.     DEMAND FOR JURY TRIAL

35)     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Demands a Jury Trial.

# IV.    FACTS COMMON TO ALL CAUSES OF ACTION

## IV.1   General Allegations

36)    In January 2005, and as a direct and proximate result of Defendants' willful and wanton misconduct against Plaintiff, he became so emotional traumatized that he became disabled and unable to work and for twelve weeks.

37)    During each of the years from 2002 to the present time Plaintiff is informed and believes that Defendants have conspired unlawfully discriminate against him by passing him over for promotions, falsifying his performance reviews, giving him unfairly low merit raises, intentionally inflicting emotional distress upon him and his family, damaging his reputation and his attempts to advance in employment within Orbital.

38)    Plaintiff is informed and believes that Defendants unlawfully violated Federal contracting and procurement laws with the procurement of the Kinetic Energy Interceptor Program (hereinafter referred to as "KEI") program thrust vector control systems from Honeywell Engine Systems in Tempe (hereinafter referred to as "Honeywell") and the GMD program thrust vector control systems from MPC. Furthermore, Plaintiff is informed and believes that Defendants have committed some or all of the acts alleged in herein in whole or in part to discriminate and retaliate against him for his opposition to such unlawful violations of Federal contracting and

12

1  procurement laws.

2         39)     On many occasions Plaintiff complained to Defendants about the

3  misconduct of Orbital's subcontractor MPC Products ("MPC"). Plaintiff informed

4  Defendants he believes that MPC's misconduct amounts to fraud.

5         40)     On approximately July 22, 2004, Plaintiff complained about wasted tax

6  payer money and failure to meet Federal Government standards with the validation and

7  verification (V&V) of the GMD actuator simulation. Plaintiff stated verbatim in his

8  weekly status report to Maganty "The problem I have with this is the wasted tax payer

9  money and Orbital effort to back fit V&V to the existing model (o50sgactmodel), and to

10 relax requirements below normal Engineering standards, and below standards as

11 outlined in the V&V requirements from Gen Holley, e.g. parameter traceability, when

12 an opportunity existed for the global V&V option".

13        41)     On approximately October 21, 2004, Plaintiff complained to Maganty in

14 his weekly status report about Maganty reversing Plaintiff's decision to manually turn

15 off hydraulic pressure during an MTTV-7 field test without providing Plaintiff an

16 opportunity to discuss the issue with Maganty. Plaintiff found out about Maganty's

17 change second hand. Plaintiff requested in his status report that Maganty communicate

18 with him better. Plaintiff on more than one occasions informed Maganty that he should

19 communicate with him better.

20        42)     Defendant Maganty on numerous occasions changed decisions Plaintiff

13

1   had mad in the performance of his management responsibilities without informing

2   Plaintiff before or after Maganty made the changes. Plaintiff on numerous occasions

3   found out about the changes second hand. In fact an employee under Plaintiff's

4   supervision complained several times about Maganty changing redirecting his tasks and

5   causing him to have difficulties performing his job. Plaintiff complained about

6   Maganty's behavior to Haynie. Haynie failed to discuss it with Plaintiff and failed to

7   stop Maganty from doing so. Plaintiff also told Defendant Sims about the complaint

8   from this certain member of Plaintiff's group. Sims also failed to discuss it with

9   Plaintiff and failed to stop Maganty's behavior. Plaintiff complained to Maganty about

10  this as well. Maganty failed to discuss it with Plaintiff. This individual told Plaintiff

11  after one time when Maganty had given him an ultimatum to finish a task by a certain

12  date that he was concerned because Maganty was the authority on his promotions and

13  On information and belief Maganty discriminated against the individual in Plaintiff's

14  group that complained to Plaintiff about Maganty's habit of giving him directions to

15  stop working on what Plaintiff had him doing and work on something else. On

16  information and belief Maganty gave this individual a low 2004 yearly raise as a direct

17  and proximate result of Plaintiff's complaint to Defendant Sims regarding Maganty's

18  treatment of this individual.  On information and belief Sims told Maganty of what

19  Plaintiff what Plaintiff told Sims about this individual's complaint and Maganty

20  discriminated against this individual because of his complaint.

14

1       43)    On information and belief Defendants misconduct regarding the

2    procurement of the KEI actuators has resulted in significant cost increases, schedule

3    delays, and increased technical risk for KEI.

4       44)    Plaintiff is informed and believes that Defendant Ogren improperly and

5    intentionally favored more lucrative aerodynamic wind tunnel testing at the expense of

6    more critical actuator testing needs based on financial motives at the expense of

7    increased technical risks for the program. In fact, Defendants failure to act properly and

8    timely regarding the importance of the actuator design and testing requirements has

9    resulted in significant cost increase, schedule delays, and technical risks for KEI.

10      45)    Plaintiff is informed and believes that Defendant Maganty deliberately

11   interfered with Plaintiff's job performance and the Actuator Group performance by

12   repeatedly and with out Plaintiff knowledge or consent changing the tasks that his group

13   members were working on. Maganty's actions had the effect of impacting Plaintiff's job

14   performance and the timely accomplishment of requirements assigned to him by

15   Maganty. Plaintiff complained about Maganty's behavior to Maganty, Haynie, and

16   Sims. Maganty, Haynie, and Sims failed to change Maganty's behavior. In fact Maganty

17   criticized Plaintiff on his performance review for matters which Maganty's actions were

18   at least in part responsible for. Further, Maganty failed to provide Plaintiff with the staff

19   he requested and then criticized him for taking on too much responsibility and not

20   completing his task on schedule, the fault of which was actually Maganty's for failing to

15

1   provided Plaintiff with sufficient staff, to stop interfering with Plaintiff's management

2   of his group, and to stop others from interfering with Plaintiff's management of the

3   group.

4       46)    Plaintiff is informed and believes that numerous employees within

5   Maganty's Department have complained about having to work for many masters.

6   Plaintiff has also expressed concerns about him doing this and the risk of bad raises and

7   reviews that it causes.

8       47)    Plaintiff is informed and believes that Defendants have unlawfully

9   established and maintained a company infrastructure within Orbital's LSG division

10  which maximizes the number of employee positions available for the sole purpose of

11  maximizing profits on cost plus and cost plus award fee Federal Government Contracts

12  and that Defendants have committed some or all of the acts alleged On many occasions

13  Plaintiff complained to Defendants about the misconduct of Orbital's subcontractor

14  MPC Products (hereinafter referred to as "MPC"). Plaintiff informed Defendants he

15  believes that MPC's misconduct amounts to fraud.

16      48)    Plaintiff is informed and believes that Defendants' misconduct against

17  Plaintiff is in whole or in part to intentionally discriminate and retaliate against him for

18  his opposition to the herein alleged unlawful business infrastructure.

19      49)    Furthermore, Plaintiff is informed and believes that Defendants have

20  committed some or all of the acts alleged herein in whole or in part to discriminate and

16

1    retaliate against him for his opposition to such unlawful violations of Federal

2    contracting and procurement laws.

3        50)    Plaintiff is informed and believes that Defendants conspired to develop

4    conditions to justify his demotion from his job as a manager.

5        51)    Plaintiff is informed and believes that Defendants acting both separately,

6    and together in a conspiracy, have systematically and routinely discriminated and

7    retaliated against employees based on their mental and physical disabilities, based on

8    their complaints about Orbital and Orbital's subcontractor's unlawful misconduct, and

9    based on their exercise of other Federally protected whistle blowing activities.

10       52)    Plaintiff is informed and believes that Defendant Orbital has knowingly

11   failed to stop the willful and wanton actions of Defendants as alleged in herein.

12       53)    On March 12, 2004, Defendants' posted a job position on the internet and

13   on Orbital Sciences internal employment opportunities intranet set. Despite the fact that

14   Plaintiff was the manager of the group within which the posted position belonged,

15   Maganty failed to tell Plaintiff that the job had been posted.

16       54)    Plaintiff found the posting by accident and became emotionally distressed

17   when he read the job description and realized it was written with the intention of hiring

18   someone practically identical to him and thus capable of replacing him as manager.

19   Plaintiff asked Maganty for an explanation. Maganty told Plaintiff that he posted the job

20   description because management had decided to eliminate Plaintiff "as a single point

1   failure". Plaintiff as a result of the extreme and prolonged emotional distress that the job

2   posting was causing him tried to get Defendants to tell him if the job posting was to find

3   a replacement for him. Defendants failed to answer Plaintiff's question and thus failed

4   to provide him with his much needed relief from his severe anxiety.

5          55)    The job posting of March 12, 2004 in revised and similar versions of the

6   original, have remained on the intranet and internet from that time to the present time.

7   Orbital Sciences has not found anyone who meets the qualifications stated in the job

8   description and has failed to fill the management position left vacant since his demotion.

9   The vacant management position has been filled in an acting capacity by a less qualified

10  individual than Plaintiff who in fact has complained that he wants to be rid of the job

11  because he has to much work to do as the newly appointed manager of the Navigation

12  Group.

13         56)    On March 12, 2004, Defendant Maganty posted a job position on the

14  company internal opportunities network for Plaintiff and for one Terry Mitchell

15  ("Mitchell"). On information and belief, these job descriptions for these positions were

16  deliberately written by Defendant Maganty in a conspiracy with other Defendants to

17  replace Plaintiff and Mitchell because they both had complained the Orbital's business

18  infrastructure and the adverse effect it was having on the technical integrity of the

19  company, the adverse effect it was having on their ability to do their jobs as managers,

20  and the wasteful spending practices of Orbital on Federal Government contracts.  When

1   Plaintiff approached Maganty to inquire about his motives for these job postings,

2   Maganty told Plaintiff that these positions had been opened because management

3   wanted to eliminate Plaintiff and Mitchell as "single point failures". By singling out

4   Plaintiff and Mitchell as single point failures and recruiting their identically

5   replacements.

6           57)    On information and belief, the timing of the two March 12, 2004 job

7   postings was a direct and proximate result of Mitchell's attempts to get management to

8   correct the problems with it's infrastructure and faulty technical decision making

9   process, and of Plaintiff's complaints to management about managements

10  discriminatory treatment Plaintiff's and of Plaintiff's group. In particular, Plaintiff on

11  approximately February 18, 2004 had a conversation with Defendant Ogren regarding

12  Defendant Mullet's harassing and discriminatory treatment of Plaintiff either earlier that

13  month or in January 2004. The details of this meeting with Ogren are discussed in the

14  following Paragraph.

15          58)    On approximately February 18, 2004, Plaintiff had a conversation with

16  Defendant Ogren in one Keith Emerson's ("Emerson") office. Emerson was present in

17  the room during the entire conversation. Ogren's administrative assistant was within

18  hearing distance just outside Emerson's office door during the conversation. Plaintiff

19  thinks another individual was either present in the room or within hearing distance at

20  some point during the conversation. Ogren made the following statements (either

19

1    verbatim or closely paraphrased and not necessarily in this chronological order) to

2    Plaintiff during this conversation; 1) A lot of people are very frustrated with you, 2)

3    You come across as very "dogmatic" and inflexible ( Plaintiff believes Ogren's

4    characterization of Plaintiff as  "dogmatic" is directly related to defendant Haynie's

5    characterization of Plaintiff as "dogmatic" during Plaintiff's interview in April 2003), 3)

6    three people said you told the ATK (Alliant TecSystems ) President that it takes eight

7    years in control systems know to what you (Plaintiff) are talking about . Ogren was

8    adamant in his opinion that Plaintiff had acted inappropriately during his conversation

9    with the ATK President. Plaintiff defended his behavior as appropriate in the

10   conversation, 4) that you (Plaintiff) "need to bend a little around here", 5) that you

11   (Plaintiff) just "need to take a deep breath and let it go". Plaintiff disagreed with

12   Ogren's characterization during the meeting of Plaintiff's character. Ogren failed to

13   withdraw or modify any statements he made during the conversation. Plaintiff informed

14   Ogren that he would defend his character and reputation and eventually the truth would

15   come out. Ogren inappropriately made the aforementioned misrepresentative statements

16   regarding Plaintiff's character in front of other individuals which know Plaintiff and

17   have no involvement in the subject matter of the conversation. They were merely

18   bystanders to the conversation. Plaintiff's reputation and attempts to advance within the

19   company were damaged by Ogren's behavior and statements during the conversation.

20   Further, in a conversation with Ogren in the company cafeteria during lunch time later

20

1    that year, and following Plaintiff's comment to Ogren that if he accomplished as much

2    as Ogren has maybe he (Plaintiff) would get a raise and a promotion, Ogren then

3    casually and in a matter of fact manner said to Plaintiff "that's not going to happen" and

4    then walked away without further comment. Also, during this same encounter Plaintiff

5    had congratulated Ogren for just being promoted to Vice President (Ogren had been by

6    word of mouth promoted and had yet to be formally recognized as promoted) and stated

7    that he (Plaintiff) did not realize there were so many Vice Presidents (at Orbital) to

8    which Ogren responded, either verbatim or closely paraphrased, that "there are more

9    than you realize". Ogren's statements to Plaintiff in the cafeteria placed Plaintiff in a

10   false light in front of a group of Orbital employees.

11        59)     A search using google of the World Wide Web returned a definition for

12   dogmatic, which is "characterized by arrogant assertion of unproved or unprovable

13   principles". This definition falsely attributed to Plaintiff personal characteristics which

14   damaged Plaintiff's reputation. On information and belief Defendants Maganty and

15   Ogren conspired to use this term to damage Plaintiff's reputation and his attempts to

16   advance with the company.

17        60)     Defendant Mullet discriminated against and harassed Plaintiff on

18   numerous occasions from the spring of 2002 to the present time. On information and

19   belief Mullet discriminated against Plaintiff by deliberately excluding him from the

20   Medium Range Target ("MRT") Critical Design Review ("CDR"). Mullet's criticism of

21

1   Plaintiff's conduct during the MRT Preliminary Design Review (PDR) was unfair and

2   unfounded, and misrepresented Plaintiff's actual behavior. Based on Mullet's criticism,

3   Maganty gave Plaintiff a negative performance review for 2003. Mullet in fact was not

4   even present during the MRT PDR during the time Mullet complained that Plaintiff was

5   acting improperly. This criticism had an unfair and adverse effect on Plaintiff review

6   and merit raise and damaged his reputation and damaged his attempts to advance with

7   the company. Plaintiff told Maganty that Mullet was not in the room and that Plaintiff

8   had acted properly and had advanced Orbital's position with the customer during the

9   MRT PDR. Despite telling Maganty this, Maganty failed to ask Plaintiff for any

10  information and proceeded to later criticize him in his yearly performance review based

11  on Mullet's version of the story.

12      61)     On or about January of 2005, the March 12, 2004 job posting was

13  removed from the "engineering" location and placed in the "financial/legal/contracts"

14  location.  This move coincided with the beginning of Plaintiff's twelve week disability

15  period. In June of 2004 Plaintiff notified HR that the posting was in the wrong location

16  and he asked them why it had been placed there. HR promptly placed it back into the

17  proper location but failed to explain the reason for the error to Plaintiff.

18      62)     On information and belief Defendants' intentionally hid the internet job

19  posting from Orbital Sciences employees including Plaintiff in order to keep them from

20  applying for the job and so they could hire an outside person to fill the manager's

22

1  position vacated by Plaintiff's demotion with someone as qualified as him.

2      63)    Plaintiff is informed and believes that on May 13th and 15th of 2005,

3  Defendants placed a newspaper add in the Los Angeles Times containing the job

4  description. On or about the third week in May 2005, an applicant responded to the LA

5  Times newspaper job add. Defendants stated to Plaintiff and others that this is the first

6  person to apply for the job since the job originally posted that is fully qualified for the

7  position.

8      64)    Defendants indicated in no uncertain terms that they were pleased to find

9  someone meeting the job requirements. Plaintiff asked Defendants if their purpose for

10  hiring this applicant is to fill the open management position. Defendants' reluctantly

11  admitted that they were indeed intending to hire him to fill the open manager's position.

12      65)    Defendants' told Plaintiff they were urgently trying to hire this applicant

13  to fill the manager's position because he was the first person they have come across that

14  is qualified for the job, and because the person currently serving as the acting manager

15  in replacement of Plaintiff wants to be rid of the job, because he has too many other

16  responsibilities. This particular individual stated this same desire.

17      66)    On information and belief, the continued vacancy of the position since

18  Plaintiff's demotion and the expressed urgent need by Defendants to fill shows that

19  Defendants' determined to discriminate against Plaintiff in violation of his federally

20  protected rights by demoting him from the position of manager.

23

67)     On information and belief Defendants secretly conspired to hire this particular applicant to fill the vacant manager's position even though there is no mention in the job posting of management.

68)     The applicant was interviewed by Defendants and by Plaintiff and by other employees and found to be not suited for the job.

69)     It has been six months since Plaintiffs' demotion and Defendants have not filled the vacant manager's position that he held.

70)     On information and belief, Defendant Haynie singled out Plaintiff and intentionally discriminated against and harassed him by refusing to approve his direct bill authorization for his trip to support the Taurus T-7 launch on December 28 and 29, 2003. Even though Haynie explained his reason for doing so to Plaintiff, on information and belief Haynie lied to Plaintiff about Haynie's real reason for doing so.

**IV.2   Six Years of Highly Favorable Reviews and Raises, 1996 - 2001**

71)     In August 1996, Plaintiff began his employment with the company as a senior engineer and technical staff member of the Guidance Navigation and Controls Department (hereinafter referred to as "GN&C Department").

72)     For each and every year from 1996 to 2001 Plaintiff's performance reviews and merit raises were highly favorable. In fact for each and every year during this time Plaintiff's overall performance ratings on his reviews were "excellent", his pay raises were above average, and he was given ratings ranging from "satisfactory" to

24

1    "excellent" for his communications, teamwork, and interpersonal skills.

2    **IV.3   Reviews and Raises, the Sudden and Negative Trend, 2002**

3    73)    In the spring of 2002 Plaintiff told Defendant Mullet that he suffers from

4    depression and takes medication for it.

5    74)    In the spring of 2002 Plaintiff told Defendant Mullet that Plaintiff has a

6    much harder time performing his job than his co-workers do because he mentally has to

7    resolve all errors or inconsistencies on the spot as when he finds them instead of

8    dismissing them as insignificant or inconsequential or delaying their resolution to a later

9    time.

10   75)    In the spring of 2002 Plaintiff complained to Mullet and his co-workers

11   that Defendant Straka was singling him out from his peers by requiring him to change

12   his flight software based on statistically unrealistic flight simulation results.

13   76)    In the spring of 2002 Plaintiff complained to Mullet and his co-workers

14   that Defendant Straka was wasting Federal Government resources.

15   77)    In the spring of 2002 Plaintiff complained to Mullet and his co-workers

16   that Straka's actions resulted in waste and misuse of Federal Government money and

17   mental abuse of him and his co-workers.

18   78)    In the spring of 2002 Plaintiff suffered an emotional breakdown and deep

19   depression as a direct and proximate result of Straka's actions.

20   79)    In the spring of 2002 Defendant Mullet was aware that Straka was

1   deliberately discriminating against Plaintiff and that by doing so Straka was also over

2   running the budget and creating harsh and unusual work conditions for Plaintiff and his

3   co-workers. Mullet failed to stop Straka's mistreatment of Plaintiff and his co-workers

4   and the associated misuse of Government funds.

5       80)   In the spring of 2002 Straka's actions against Plaintiff and Mullet's failure

6   to stop Straka's misconduct discriminated against Plaintiff based on his mental

7   disabilities or retaliation his complaints of wasteful spending of government funds or for

8   both of these reasons combined.

9       81)   In the spring of 2002 Straka's actions against Plaintiff and Mullet's

10  failure to stop Straka's actions were retaliatory against Plaintiff for Plaintiff's

11  opposition against Straka's discriminatory behavior and Straka's waste and misuse of

12  Federal Government funds.

13      82)   In the spring of 2002 changes were made to Plaintiff's flight software

14  design per Straka's mandate. These changes had no effect on the subsequent fully

15  successful flight of the launch and in fact actually increased the risk of a flight failure.

16      83)   In the spring of 2002 Orbital's customer, namely the U.S. Army Officer in

17  charge of the OT-2a mission, became frustrated with Straka's actions and personally

18  assumed responsibility for the risks associated with a flight failure, as Straka had

19  defined it at that time, in order to avoid further delays in launching the vehicle.

20      84)   In February 2003, Defendant Maganty gave Plaintiff his 2002 yearly

26

1  performance review in which Plaintiff received his first negative rating for teamwork

2  and interpersonal skills since he began employment with Orbital. Despite the fact that

3  Plaintiff's job performance rating was above average raise was about one-half of what it

4  had been for the prior four years and was the lowest it had ever been since Plaintiff

5  started work for Defendant Orbital. Maganty told Plaintiff he got a low raise because he

6  had "lost his focus". Plaintiff's review was discriminatory based on his mental

7  disabilities and retaliatory based on his opposition to discrimination and the waste and

8  misuse of Federal Government funds.

9      85)    In June 2004, Plaintiff complained to Defendant Sims about the sudden

10  change and negative pattern in his reviews and raises beginning in 2002. Plaintiff at that

11  time requested to see his personnel file and proceeded to show Sims the sudden change

12  in his raises starting in 2002. Defendant Sims stated to Plaintiff "I see what you mean"

13  in acknowledgement that there was indeed a sudden and continuous drop in Plaintiff's

14  raise amounts. Defendant Sims also acknowledged that Plaintiff's raises were higher

15  than average before 2002.

16      86)    Defendant Maganty told Plaintiff that the reason he gave him a low raise

17  (for the year 2002) is because he had lost his focus. Maganty's statements and action

18  regarding Plaintiff's 2002 yearly raise was discrinatory against Plaintiff based on his

19  mental disability.

20      87)    Defendant Maganty told Plaintiff that the reason he gave him a low raise

27

1    (for the year 2003) is because he needed to improve his image. Maganty told Plaintiff

2    that he needed to work with Maganty to improve his image so hat he would have a

3    reason to fight for him for a good raise. Plaintiff's 2003 yearly raise was discrinatory

4    against Plaintiff based on his mental disability.

5        88)    In June 2004, when Plaintiff complained to Defendant Sims about the

6    negative and false statements in his performance reviews, Defendant Sims told him that

7    "no one is going to look at these (performance reviews)."

8        **IV.4   Plaintiff Becomes an Orbital Supervisor, 2003**

9        **IV.5   First Meeting with Haynie, Interview for the Job**

10       89)    In April 2003, Defendant Maganty offered Plaintiff the opportunity to

11   lead a newly created actuator group within the Guidance, Navigation, and Control

12   ("GN&C") Department. Maganty was Plaintiff's immediate supervisor and Director of

13   the GN&C Department. Maganty informed Plaintiff that he must attend a prerequisite

14   interview for the job with Defendant Haynie and that he would be placed in the position

15   in a trial status.  Plaintiff accepted the offer and agreed to meet with Haynie. Maganty

16   and Plaintiff met with Haynie in his office for the interview. Haynie treated Plaintiff

17   with hostility from the start of the meeting and continued to do so throughout the

18   meeting. Haynie began the meeting by telling Plaintiff that "your job performance over

19   the past twelve to eighteen months has not been what we expected it to be". Plaintiff

1   told Haynie that Maganty had told him that his job performance was good. Haynie then

2   responded to Plaintiff saying "everyone has their own opinion about that." Maganty

3   failed to correct Haynie regarding Plaintiff's excellent job performance as

4   communicated to Plaintiff verbally and in writing. Maganty did speak up for Plaintiff in

5   his defense by stating to Plaintiff that "it is not all bad because people come to you for

6   actuator help. You are sought out and your opinions are respected". Plaintiff believes

7   Maganty made this statement to Plaintiff in part due to his empathy for Plaintiff's

8   obvious emotional distress, and in part because he disagreed with Haynie's assessment

9   of Plaintiff's job performance. In spite of Plaintiff's obvious state of emotional distress,

10  Haynie failed to show any empathy for Plaintiff by either adjusting the tone of his voice

11  or his facial expressions, or by toning down his criticism of Plaintiff.

12      90)    Defendant Haynie made the following statements to Plaintiff during the

13  subject interview of Paragraph (89):

14  a) Your performance has not been what we have expected of you for the past twelve

15      to eighteen months.

16  b)  No man is an island.

17  c) I'm not saying we want you to act like robots.

18  d) You have a reputation for being dogmatic. You are too dogmatic.

19  e) We need to make money. This is a business.

20  f) You need to stop throwing poison darts.

29

1    g) You need to stop coming in at the last minute and raising issues.

2    h) The GMD duty cycle may not have included all you wanted but it was good

3        enough to capture what we needed.

4    i) I recall you said in no uncertain terms that you wanted to head up an actuator

5        group and were critical of the way (the) GMD static fire was handled.

6    j) You are on a trial basis.

7    k) See that Prasad gives you a review after three months.

8        91)    The statements made by Defendant Haynie during the initial interview

9    initial interview in April 2004 contained false and unfounded criticism of Plaintiff and

10   have damaged his reputation and attempts to advance with the Company and have

11   caused him to suffer extreme emotional distress.

12       92)    On information and belief, the statements made by Defendant Haynie

13   during the initial interview in April 2004, were made deliberately to coerce Plaintiff into

14   making emotional statements in his defense that would have allowed Defendant Haynie

15   the cause to deny Plaintiff of the supervisory position for which he was applying.

16       93)    On information and belief, the statements made by Defendant Haynie in

17   during the initial interview (ref. Paragraph (90) ) were made to coerce Plaintiff into

18   performing his job with the objective of making money for the Company as opposed to

19   performing his job to ensure product quality and technical integrity.

20       94)    The written and verbal statements and actions by Defendants Haynie and

30

1    Maganty during Plaintiff's interim review meeting caused Plaintiff to suffer extreme

2    emotional distress and have damaged his reputation and attempts to advance with the

3    company.

4    **IV.6 _ Second Meeting with Haynie, First Written Review as a Supervisor**

5        95)      On September 25, 2003 Plaintiff asked his immediate supervisor

6    Defendant Maganty for a fair and objective performance review in the presence of

7    Maganty's supervisor Defendant Haynie and a representative from HR.  Plaintiff did so

8    in part to relieve his anxiety and emotional distress over prior and expected future unfair

9    and biased treatment by Maganty and Haynie. Plaintiff's anxiety and emotional distress

10    increased when told by Maganty on or about September 19, 2003 that Haynie wanted to

11    have Plaintiff's review by the end of the month and that Haynie had been talking to

12    people as to Plaintiff's performance.  Plaintiff was informed and believed that Haynie

13    was constructing a preconceived negative performance review for Plaintiff. Plaintiff on

14    September 25, 2003, also asked Maganty for an explanation of Defendant Haynie's

15    statement to Plaintiff in April 2003 that Plaintiff's performance had not been

16    satisfactory over the past twelve to eighteen months when Maganty had rated Plaintiff's

17    performance as good.  Also on September 25, 2003 Plaintiff informed Maganty that his

18    failure to provide Plaintiff with the staff needed to support his customers as agreed to

19    when Plaintiff accepted his management position was interfering with his ability to do

20    his job and that he feared this would damage Plaintiff's job performance rating. Plaintiff

1   at the same time also complained to Maganty this lack of support was emotionally

2   distressing to him. Plaintiff provided the same and all of the information heretofore

3   stated in this paragraph to Maganty's supervisor, Defendant Haynie, and to the HR, i.e.

4   Defendant Sims.

5       96)   On September 29, 2003, Defendant Maganty gave Plaintiff a written

6   review. The review document was not written on the Company standard performance

7   appraisal form. The review consisted of two typed pages containing no title, dates,

8   names, or signatures. The review was not placed in Plaintiff's personnel file as are all

9   yearly performance reviews. Defendant told Plaintiff during a meeting in June 2004 that

10  he was unaware the review had occurred. Defendant Sims was on vacation during the

11  review.  The review consisted of two topics each with 2 subtopics followed by a

12  summary. The topics were "Responsibilities" and "Evaluation". The two subtopics were

13  common to each Topic and were "Technical" and "Attitude and personality". The

14  review is rewritten exactly as it appears on the original document in the following

15  paragraphs.

16      97)   This Paragraph contains the text verbatim contained in the "Technical"

17  subtopic of the "Responsibilities" topic of Plaintiff's written interim review on

18  September 29, 2003;

19      Responsibilities:

20          1.  Technical:

32

1                a.  Develop simple and common actuator models.

2                b.  Documentation (we talked about the content).

3                c.  Archive and configure both nonlinear and linear models.

4                d.  Support field testing.

5                e.  Support actuator procurement specification.

6     98)    This Paragraph contains the text verbatim contained in the "Attitude and

7  personality" subtopic of the "Responsibilities" topic of interim review as defined herein

8  and above;

9            Responsibilities:

10           2.  Attitude and personality:

11               a.  Attitude and inter-personal skills consistent with the service

12                    oriented position. Engineers should feel comfortable and

13                    encouraged to use the services of the group.

14               b.  Observe sensitivity to others. Give and take approach.

15    99)    This Paragraph contains the text verbatim contained in the "Technical"

16  subtopic of the "Evaluation" topic of Plaintiff's interim review as defined herein and

17  above;

18            Evaluation:

19           3.  Technical:

20               a.  Considered as resident technical actuator expert. However,

you have taken firm/forceful opinions in some cases that could have been dealt otherwise. These issues have created unnecessary road blocks and stressful environment. Examples include:

- Handling of the BV-6 peak hydraulic pressure modeling during the ignition transient. Given you level of experience/seniority, it appeared pre-mature to take a firm position (statements like "for the record") based on the results of a brand new and not completely validated mathematical model.

- COLD/HOT NULL and back drive models for stage 1 GMD actuator model. The model may not be accurate, but there is a conservative approach that balances schedule and technical risks.

- BV-6 field frequency test data approval. Initially, refused to approve the test, even after discussing the out come of the results, with respect to the autopilot stability margins, at an FRB.

100)   This Paragraph contains the text verbatim contained in the "Attitude and personality" subtopic of the "Evaluation" topic of subject review as defined in herein

34